THE LAW OFFICES OF
# Andrew J. Frisch, PLLC

ONE PENN PLAZA
53rd FLOOR
NEW YORK, NEW YORK 10119
(212) 285-8000
FAX: (646) 304-0352

JASON D. WRIGHT
ADMITTED IN NEW YORK, VIRGINIA
AND THE DISTRICT OF COLUMBIA
OF COUNSEL

November 5, 2018

*By ECF and Email*

The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: *United States v. Jacqueline Tsai*
     *Criminal Docket No. 17-198 (KMW)*

Dear Judge Wood:

  On behalf of Jacqueline Tsai in advance of this week's scheduled sentencing, I respectfully request that the Court accept and consider this short reply to the government's memorandum in aid of sentencing, filed on October 31, 2018.

  As Ms. Tsai acknowledged in her initial submission, the government has a legitimate argument that imprisoning her would further the statutory goal of punishment: the community speaks reasonably in seeking imprisonment as a just response to criminal conduct of the nature, duration and extent at issue. Punishment is not, however, the only or even the paramount consideration.

  A recent contribution to the national dialogue about America's obsession with prison as the *sine qua non* of American justice is an article in the current *New Yorker* entitled "*Separated; Sending a mother to prison can have a catastrophic effect on her children. Why, then, does America lock so many women up,*" Nov. 5, 2018, at 42. Perhaps depending on perspective or bias, Ms. Tsai can be seen as equally, more or less sympathetic than the women of Tulsa on whom the article is focused. Either way, the words *of the government* cited in the article, spoken by Democrats and Republicans alike, apply to Ms. Tsai. Oklahoma Governor Mary Fallin considered the rate of incarceration to be "a generational curse" that broke up families. The Speaker of the Oklahoma House believed it irresponsible "to continue to throw more money on a broken system." *Id.* at 44. Attorney General Loretta Lynch, then in charge of

federal prosecutions like Ms. Tsai's, is quoted in the article as saying:

> Put simply, we know that when we incarcerate a woman we often are truly incarcerating a family, in terms of the far-reaching effect on her children, her community, and her entire family network.

*Id.* The United States Department of Health and Human Services has found that children of incarcerated parents are at increased risk of mental-health conditions, drug abuse, and various physical ailments including HIV/AIDS. *Id.* One hopes that the lion's share of Americans, Republican or Democrat, disagree with the view of the current Secretary of Homeland Security that separating families to punish and deter is, "[i]n the United States, [what] we call . . . law enforcement." *See id.*

The government in this case identifies precisely what ails us by claiming that "[Ms.] Tsai should not be treated differently merely because she is a woman." Gov't Letter at 6. The government's question is fair only if we assume that prison is an American moral imperative. The statutory command of parsimony, however, requires that *no one* be unnecessarily imprisoned, no matter their demographic, background *or gender*, if and where the balancing of the statutory sentencing factors favor a different result. A prosecutor in Tulsa is quoted in the article as saying, "If women are equal, then they are equal in all ways, including the idea that there are women to whom you have to say, 'Goodbye!'" A New York lawyer who relocated to Tulsa to assist aggrieved women characterized this ideology as "vengeful equity." *Id.* at 51.

The *New Yorker* article helps explain why Ms. Tsai's sentencing is especially difficult. Meanwhile, with due respect, the government's memorandum does not constructively advance the dialogue. For example, Tsai's ▬▬▬ (or at least her fealty to an abusive mother) is demonstrably not fabricated. The government cites Ms. Tsai's use of ill-gotten gain to make payments on student loans, which the government describes as a "personal expense" that "accrued to the benefit of [Ms.] Tsai and her husband." Gov't Letter at 2. The government does not proffer corroborating proof in the form of school or loan records *because neither Ms. Tsai nor her husband were students who owed payments on loans*; the payments were made for Ms. Tsai's sister who was a student at the University of California at San Diego. An invoice for the sister's loan payment is attached. Likewise, the Tsais' bank records show periodic payments of $3,000 to "Jacq Dad," and payments to Chase Home Finance for $3,011.43, the amount of the mother's mortgage. These payments and others, some shown on the attached bank records, were demanded by Ms. Tsai's mother.

We appreciate that it is difficult to untangle the Tsais' finances and separate what was paid from fraud as opposed to legitimately earned income. We also appreciate that Ms. Tsai's state of mind does not necessarily and ineluctably compel a non-custodial sentence. That state of mind, however, is real. Notwithstanding the government's cherry-picking of Dr. Beattey's report, he concluded that Ms. Tsai was neither feigning nor malingering, and ▬▬▬

2

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ no matter her financial limitations and the personal consequences. In fact, as the government acknowledges, Ms. Tsai continued to steal even though one of her employers was like family to her [see Gov't Letter at 5], and even though she had to have realized that prosecution was inevitable. See Gov't Letter at 3. More, as an Officer of the Court, I unequivocally represent that Ms. Tsai told me from my initial meetings with her years ago that she stole from her employers out of a sense of familial obligation to an abusive mother. She did not fabricate her report for Dr. Beattey; to the contrary, her unhealthy fealty to her mother was precisely the reason that I sought to adjourn sentencing until we secured funding for Dr. Beattey's evaluation and balanced report, which credibly confirms Ms. Tsai.

AUSA Magdo's narrative of the history of Ms. Tsai's legal representation [Gov't Letter at 3] is misleading. Before indictment, Ms. Tsai retained an attorney, who met with the government on Ms. Tsai's behalf assisted by a junior attorney in his firm, while Ms. Tsai's criminal conduct was apparently continuing. That attorney thereafter withdrew from Ms. Tsai's representation, referred Ms. Tsai to me, and transferred an unearned portion of his retainer to me as an initial payment toward my fee. AUSA Magdo's report to the Court that Ms. Tsai "retained two New York attorneys" to represent her creates the false impression, no doubt unintended, that I was one of the "two New York attorneys" retained by Ms. Tsai who met with AUSA Magdo; in fact, Ms. Tsai was not referred to me until after predecessor counsel and his associate had met with AUSA Magdo. More, because Ms. Tsai has been unable to compensate me beyond the unearned funds in predecessor counsel's escrow account, I applied to the Court under the Criminal Justice Act to fund Dr. Beattey's evaluation and volunteered that I would not seek further compensation for legal fees under the Criminal Justice Act or otherwise.

We imprison too many people of both genders, and we do so even where the necessity of doing so is not plain and risks more harm than good. Ms. Tsai is the principal caretaker for three children, including a one year-old and a six year-old, who cannot easily be handed off to their father, who indisputably works seven days a week to sustain his family's shoestring existence, nor other members of Ms. Tsai's dysfunctional family who are not significantly involved in the children's lives. Ms. Tsai needs regular psychotherapy to address and eliminate her destructive ways of thinking; the government's confidence in prison as a one-size-fits-all panacea is misplaced. No damage will be done to the government's legitimate pursuit of justice if a sentence is fashioned that accounts for the entire reality of the facts and circumstances.

Respectfully submitted,

/s/
Andrew J. Frisch

cc: AUSA Christine Magdo

Enclosures